**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

26 Federal Plaza
New York, New York 10278

The Honorable Jennifer H. Rearden
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

   **Re:** *United States v. Donovan Hall*, S1 24 Cr. 708 (JHR)

Dear Judge Rearden:

   The Government respectfully submits this letter in advance of the October 30, 2025 sentencing of Donovan Hall ("Hall" or the "defendant"). On February 20, 2025, the defendant pled guilty, pursuant to a plea agreement, to making threatening interstate communications, in violation of Title 18, United States Code, Section 875(c), and interstate stalking, in violation of Title 18, United States Code, Section 2261A(2)(B). The parties have stipulated, and the Probation Office agrees, that the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range is 41 to 51 months' imprisonment (the "Stipulated Guidelines Range").

   For the reasons set forth below, the Government seeks a sentence within the Stipulated Guidelines Range. Such a sentence would is necessary to reflect Hall's months-long campaign of intimidation against Jewish individuals; the ongoing danger he poses to Jews (as demonstrated by his personal messages, which reveal deep-seated anti-Jewish animus, and his possession of guns and other weapons he used to inflict terror on Jews); and to afford adequate deterrence to both Hall and to others who seek to engage in hate-motivated threats.

### A. The Defendant's Offense Conduct

   Over a period of three months, the defendant contacted individuals in New York approximately 1,000 times and made anti-Semitic and violent threats to torture, mutilate, and murder them and their families. (*See* Presentence Investigation Report ("PSR") ¶¶ 8-18). The offense conduct began on or about August 8, 2024, and continued until the defendant's arrest on November 22, 2024. (*See id.*).

   The targets of the defendant's campaign of terror included Victim-1, the owner of the Manhattan-based Hotel, Victim-1's wife ("Victim-2"), and an employee who worked at the Hotel ("Victim-3"). (PSR ¶ 8). A family member of Victim-1—Individual-1—is a member of the Israeli Defense Force ("IDF"). Victim-1 and Victim-2 currently reside in New Jersey. (*Id.*).

   In July 2024, Individual-1 posted two videos on a social media platform depicting the explosion of a structure and the firing of a gun (the "Videos"), which were filmed during his service for the IDF. (PSR ¶ 8). After Individual-1 posted the Videos, the Videos were reposted on a social

1

media platform, along with a reference to Individual-1's familial connections to the owner of the Hotel (i.e., Victim-1). (PSR ¶ 10). Thereafter, several threatening messages commenting on the Videos were posted by anonymous users on the Hotel's profile page on the social media platform, as well as the Hotel's website. (*Id.*). In addition to these posts, Individual-1's personal information, including his home address, and the Hotel's contact information were posted on websites on the Internet available to the public. (*Id.*).

Beginning on August 8, 2024, Hall, using a phone registered in his father's name (the "Hall Phone"), initiated a campaign of intimidation against Victim-1 and the Hotel staff, calling Victim-1's personal cellphone and the Hotel approximately 50 times between August 8 and August 9, 2024. (PSR ¶ 11). These calls included terrifying threats. On one call on or about August 9, 2024, Hall stated, in substance and in part, that he was going to kill Victim-3, that he was going to travel to the Hotel on his motorcycle, and that he was going to shoot Victim-3 in the head. (*Id*). On another one of these calls, Hall threatened, in substance and in part, to come to Victim-1's residence in New Jersey (and correctly noted Victim-1's home address), and said that he was going to shoot Victim-1 and kill him and his family. (*Id.*). On yet another call that same day, this one on a recorded line, Hall told Victim-1 and Victim-3:

- "I'm gonna take my meds and I'm gonna come shoot you in the head, okay?"
- "You're going to be laughing whenever I'm burning you alive."
- "As soon as I find you, I'm gonna pull your wallet out and I'm gonna go kill your whole fucking family."

(PSR ¶ 12). Also on or about August 9, 2024, Hall called the Hotel on a recorded line and told Victim-1 and Victim-3 the following:

> Hey I got your Jew daddy's address in New Jersey. You hear me, [Individual-1], I'm going to find you, you thought you were gonna hide? … I can hear the inbreeding in your voice, you fucking Jew bag … I talked to daddy today, I talked to daddy and he got scared and hung up whenever I asked for [Individual-1] … he blocked my phone number because he's a scared little bitch… you know how funny that is that you're going to kill children, but whenever a man says something to you, you wanna hide behind fucking women … I'm gonna fuck your asshole, buddy. I'm going to rip you in two … I'm gonna kill you. I am going to kill you  I'm going to kill you... I'm coming to your fucking house [recites address of Victim-1 and Victim-2's residence]... you're gonna see on the fucking news bitch and then I'm coming for you... now that I know he's in Jersey with me, it's fucking over... let me talk to that Jew behind you, let me talk to that child-murdering Jew behind you… Hey, I'm gonna kill you. You hear me… I'm going to kill you, you fucking Jew, I'm going to rip your fucking Shylock nose off and shove it up your fucking ass… you're about to see some Hitler shit in real fucking life… I'm coming to your fucking hotel and turning it into a Gaza

2

> building… I'm gonna burn your fucking building to the ground with you inside of it and all your Jew friends.

(*Id.*).

Later that day, an NYPD detective ("Detective-1") called a number associated with Hall's father (the "Father") in an attempt to confirm Hall's identity. (PSR ¶ 13). When no one answered Detective-1's call, he left a voicemail for the Father. (*Id.*). That same day, Detective-1 received a phone call from Hall who identified himself to Detective-1. (*Id.*). When Detective-1 told Hall that Hall was being accused of threatening the staff of the Hotel, Hall did not deny making threatening calls to the Hotel and made multiple references to calls he had with the Hotel, stating that he (Hall) was threatened by the Hotel staff. (*Id.*). Several minutes after Detective-1's call with Hall, Detective-1 received a telephone call from the Father. (*Id.*). On this call, the Father confirmed that his son, Hall, was the user of the Hall Phone. (*Id.*). The Father also noted that other law enforcement entities had been investigating Hall stemming from similar threatening statements made by Hall. (*Id.*).

Hall's pattern of threats only intensified thereafter. Approximately a month later, on or about September 4, 2024, Hall called the Hotel on a recorded line and spoke with Victim-1. (PSR ¶ 14). During this call, Hall referenced receiving a call from someone identifying himself as a police officer and then proceeded to make numerous anti-Semitic statements, repeatedly threatening to kill Victim-1 and Individual-1 and to blow up the Hotel. (*Id.*). During the September 4 call, Hall stated the following, among other things:

- "You know who needs help is [Individual-1]. He needs help shooting himself in the fucking head."
- "Where's [Individual-1] at so we can string his ass up?"
- "Wait till I put you back in that fucking oven… with my bare fucking hands, Jew."
- "Are you gonna come outside your building so I can fuck your face up… walk outside you fucking queer."
- "Psychopathic Jew, genocidal maniacs that think they can get away with whatever, I'm going to fucking slit your throat, you stupid bitch, you hear me? I'm going to take you and [Individual-1] and fucking kill you. I'm going to take your balls and I'm gonna hang you upside fucking down."
- "How about I go ahead and get ahold of [Victim-2], huh?... Does that sound like fun? She's at home right? She's at home right? And I can just go to your house is what you're saying, right?"
- "Where's that pussy ass bitch [Individual-1]? I'm going to turn [Individual-1] into a woman."

(*Id.*).

The following day, on or about September 5, 2024, Hall left a recorded voicemail on Victim-1 and Victim-2's home telephone line in New Jersey where he stated the following, among other things: "it's [Victim-1], the inbred Jew… if he ever came face to face with me, would fucking meet his demise, fucking pussy." (PSR ¶ 15).

3

A few weeks later, on or about September 24, 2024, Hall called the Hotel on a recorded line and spoke with Victim-3, stating the following, among other things:

- "You think you're fucking tough, bitch.  I'm gonna fucking murder your whole fucking family once I rip your wallet out your pocket."
- "Yeah.  I'm gonna kill your daughter, for sure."
- "Because once I see you, and once you stop breathing, I'm heading to your daughter next."
- "I'm gonna rip your fucking heart out"

(PSR ¶ 16).

Altogether, between on or about August 8, 2024, and November 20, 2024, Hall, using the Hall Phone, contacted the Hotel, its owners, and its employees at least 971 times and made numerous threatening, intimidating, and anti-Semitic statements during those communications. (PSR ¶ 17).

On or about October 15, 2024, Hall sent Victim-1 the following messages and images ("Image-1," "Image-2," and "Image-3"), among other things:

**Image-1:**



Image-2:



Image-3:



(PSR ¶ 18).

### B. Evidence Obtained at the Time of the Defendant's Arrest

On or about November 22, 2024, the date of the defendant's arrest, law enforcement conducted a search of the defendant's residence. (PSR ¶ 20). During the search, law enforcement recovered, among other things, the following in either the defendant's room or the common room: (i) the firearms depicted in Image-3—a Ruger GP100 .357 Magnum and a Sig Sauer 1911-22— the latter of which was loaded with 10 rounds; (ii) the machete depicted in Image-2; (iii) an additional firearm; (iv) more than 660 rounds of ammunition; (v) brass knuckles; and (vi) 7 large machete-type knives. (*Id.*). The two firearms depicted in Image-3 were located alongside the defendant's wallet in his backpack in his room. (*Id.*). The third recovered firearm—a rifle—was recovered on the floor of the common room of the defendant's residence, which the defendant shares with three adults, along with the children of two of the adults. (*Id.*). None of the firearms located in the residence—including those depicted in the defendant's text messages and found in his backpack—are registered in the defendant's name. (*Id.*).

### C. The Defendant's Pattern of Threatening Conduct

In addition to the hundreds of threats made against the victims, Hall has a history of threatening, intimidating, and stalking other individuals as well. (*Id.*). For example:

- In or about March 2024, Hall used the Hall Phone to threaten an Indiana judge and family members of the judge. (PSR ¶ 21). Specifically, Hall threatened to murder the judge and contacted the judge's family members, sometimes in the middle of the night. (*Id.*). During one of these calls, Hall told one of the judge's family members: "I'm going to fuck your family up" before threatening to come to the family member's residence in the next week. (*Id.*). When Hall was contacted by law enforcement, he became hostile and made indirect threats to the officer. (*Id.*). On or about March 15, 2024, following Hall's threats to the Indiana judge, her family, and law enforcement, a warrant was issued in Clark County Circuit Court for Hall's arrest. The arrest warrant remains outstanding. (*Id.*).

- On or about June 26, 2024, Hall used the Hall Phone to make threatening and anti-Semitic calls to employees of a jewelry store in Astoria, New York. (PSR ¶ 22). A family member of the jewelry store owner served in the IDF, which Hall repeatedly mentions during his threats. (PSR ¶ 22).

- On or about October 30, 2024, Hall used the Hall Phone to call an employee of an organization that advocates against anti-Semitism in Pittsburgh, Pennsylvania. (PSR ¶ 23). During the call, and in subsequent voicemails sent to the employee, Hall, in substance and in part, made anti-Semitic statements and threatened that he would be seeing the employee soon. (PSR ¶ 23).

- On or about November 7, 2024, Hall used the Hall Phone to send two voicemails to a Nevada-based organization that supports IDF soldiers. (PSR ¶ 24). In the first voicemail, Hall stated, "Hey, you inbreds. You need to get the fuck out of America before we find you. You gonna sit here in dual citizenship, and uh, not fight for your own country but go over and murder children? You need to get out right fucking now before we come and show up. I'll be calling back again. And then after I call again, I'm gonna show up in person."

(*Id.*). In the second voicemail, Hall stated: "I told you bitch I was gonna leave one more fucking message, and then I'm gonna show up in person. You gonna operate on American soil; you are an enemy to Americans and will be treated as such. See you soon." (Ex. A ¶ 11). (PSR ¶ 24).

**D.     Guilty Plea and Applicable Guideline Range**

On February 20, 2025, Hall pled guilty, pursuant to a plea agreement, to (i) Count One of the Superseding Information, which charged him with making threatening interstate communications, in violation of Title 18, United States Code, Section 875(c); and (ii) Count Two of the Information, which charged him with interstate stalking, in violation of Title 18, United States Code, Section 2261A(2)(B). (PSR ¶ 4). The total maximum term of imprisonment on Counts One and Two is 15 years. (PSR ¶ 86).

The plea agreement provides that the Guideline applicable to the offense charged in Count One is U.S.S.G. § 2A6.1. (PSR ¶ 4). Pursuant to U.S.S.G. § 2A6.1, the base offense level for Count One is 12. (*Id.*). Because the offense involved more than two threats, two levels are added pursuant to §2A6.1 (b)(2)(A). (*Id.*). Moreover, since the offense resulted in the substantial disruption of business functions or services, four levels are added pursuant to §2A6.1(b)(4)(A). (*Id.*). Finally, because the defendant intentionally selected Victim-1 because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity disability, or sexual orientation of the person, three levels are added pursuant to §3A1.1(a). (*Id.*). Here, the defendant intentionally selected Victim-1 because of his Jewish faith. (*Id.*). In accordance with the foregoing calculations, the adjusted offense level for Count One is 21. (*Id.*).

With respect to Count Two, the Guideline applicable to the offense is U.S.S.G. § 2A6.2. (PSR ¶ 4). Pursuant to U.S.S.G. § 2A6.2, the base offense level for Count Two is 18. (*Id.*). In accordance with U.S.S.G. § 2A6.2(b)(l)(D) and (E), because the offense involved (i) the possession, or threatened use, of a dangerous weapon; and (ii) a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim, four levels are added. (*Id.*). As with Count One, three levels are added pursuant to §3A1.1(a), because the defendant intentionally selected Victim-1 because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of the person—specifically Victim-1's Jewish faith. (*Id.*). In accordance with the foregoing calculations, the adjusted offense level for Count Two is 25. (*Id.*).

Counts One and Two are grouped for Guideline calculation purposes because, pursuant to U.S.S.G. § 3D1.2(b), they involve the same victim, and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. (PSR ¶¶ 4, 33). Pursuant to §3D1.3(a), the offense level applicable to the Group is the offense level for the most serious count in the Group, which is Count Two with an offense level of 25. (PSR ¶ 4). After three levels are removed for the defendant accepting responsibility pursuant to U.S.S.G. § 3E1.1, the offense level for Count Two is 22. (*Id.*).

Since the defendant is in Criminal History Category I, the plea agreement provides that the Stipulated Guidelines Range is 41 to 51 months' imprisonment to be followed by a term of three years' supervised release. (PSR ¶ 4). The United States Probation Office calculates the same Guidelines range (PSR ¶¶ 32-44) and recommends a Guidelines sentence of 41 months' imprisonment. (PSR at 25).

**E.    Discussion**

   **1.    Applicable Law**

In addition to the Guidelines, which are not mandatory, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall v. United States*, 552 U.S. 32, 50 & n.6 (2007).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)  to afford adequate deterrence to criminal conduct;
> (C)  to protect the public from further crimes of the defendant; and
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

   **2.    The Section 3553(a) Factors Support a Guidelines Sentence**

In this case, each of the 3553(a) factors supports the imposition of a sentence within the Stipulated Guidelines Range of 41 to 51 months' imprisonment.

*First*, the nature and circumstances of the offense are extremely serious. The defendant targeted Jewish victims with a sustained campaign of intimidation, terror, and harassment. The approximately 1,000 threats he sent were alarming and brazen. To maximize fear in his victims, he named the locations and precise addresses where they lived and worked. He weaponized language that was vitriolic, specific, and steeped in hate. For example, by repeatedly referencing Hitler and the Nazis in threats to Jewish victims, the defendant intentionally sought to bring terror to his targets. (*See, e.g.*, Ex. A ¶ 5(h) ("I'm going to kill you, you fucking Jew, I'm going to rip your fucking Shylock nose off and shove it up your fucking ass . . . you're about to see some Hitler shit in real fucking life"); *id.* ¶ 5(m) ("Wait till I put you back in that fucking oven . . . with my bare fucking hands, Jew.")). Without mincing words, the defendant explained how he would rape,

mutilate, and murder the victims and their families—threats that felt all too real when combined with his knowledge of specific personal details about the victims, including their home addresses.

But the defendant did not just deploy intimidating language. For one, the defendant amplified his terror campaign by sending photographs of his arsenal of weapons: multiple firearms and a machete. In addition, the defendant's conduct in this case was extraordinary in its duration and persistence, its escalation over time, its use of weapons in his possession, and the fear the defendant sought to instill in the victims. The timing of these threats, which occurred over many months, demonstrate that this was not a momentary lapse in judgement for the defendant—or "merely impulsive and reactive," as defense counsel claims (Def. Mem. 2)—but a deliberate pattern of criminal conduct to terrorize innocent victims.

The impact of the defendant's actions on the victims cannot be overstated. Victim-1 writes that "[f]or more than three months, my family, employees, and I lived in a state of relentless fear caused by Donovan Hall. His campaign of harassment, intimidation, and anti-Semitic and racist hate invaded every corner of our lives—our home, our business, and even our sense of safety as parents." (Ex. A). Victim-1 continued: "He called our business, our home, and my personal cell phone often dozens of times a day, including in the middle of the night. He would say that he was outside our door or 'on the way,' threatening to kill us, mutilate us, and rape our staff. He repeated our home address aloud during his threats, a chilling reminder that he knew exactly where we lived." (*Id.*). The threats also extended to Victim-1's children: "We constantly feared for our children's safety. The thought that someone who hated enough to want to kill us and our children us was unbearable. The fear our children felt, and the anxiety it caused them, made this period extraordinarily difficult to cope with as a family. Every sound outside, every unfamiliar car, every late-night phone call filled us with dread." (*Id.*). Only adding to the terror of the victims was the defendant's invocation of incredibly painful imagery in Jewish history, such as the "Gas Chambers and Crematoriums." (*Id.*). Meanwhile, the impact to the Hotel and its operations was immense:

> At our workplace, the impact was devastating. Our employees were terrified. One young woman quit after receiving one of his calls. An intern placement agency withdrew its students, fearing for their safety. The constant ringing of the phones, tied up by his repeated calls, brought our business to a standstill and filled the air with panic. We would watch the door or call the police to say he was on his way. Taking away police resources from places, it was needed.

(*Id.*). Simply put, the defendant wreaked havoc on both the public and private lives of the victims with his vile and racist threats.

Importantly, the seriousness of these threats cannot be measured merely by the heinous threats communicated to the victims here. In passing the Hate Crimes Act, Congress found "a prominent characteristic of violent crime motivated by bias is that it devastates not just the actual victim and the family and friends of the victim but frequently savages the community sharing the traits that caused the victim to be selected." *See* Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act, Pub. L. No. 111-84, 123 Stat. 2190, 2835 (2009). This sentiment is particularly relevant here, where the defendant chose to threaten the lives and livelihoods of Jews because they

were Jewish. Hate motivated threats such as the defendant's conduct sends a message to an entire group of people that its members are not safe. It targets communities, dehumanizing them, and reinforcing the idea that they are vulnerable due to their perceived otherness. This is an unacceptable message in New York City, or anywhere else in the United States. And it is a particularly pernicious message to be sending at this moment in time, as anti-Semitic acts are steeply on the rise in this city and across this country. According to hate crimes data from the FBI for 2024, Jews, who account for approximately 2% of the U.S. population, are victims in 69% of religiously-motivated hate crimes.[1] In fact, 88% of religious-based hate crimes in New York City targeted Jewish victims, the largest share of all such crimes.[2] Against this backdrop, Hall's campaign of violence is not merely a collection of run-of-the-mill threats. Accordingly, a sentence within the Stipulated Guidelines Range is necessary to reflect the broader societal harm caused by the defendant's hateful actions.

In arguing for a below-Guidelines sentence, the defendant claims that this case "does not involve violence, weapons, or planning." (Def. Mem. 4). He is wrong on all three scores. Taking these one at a time, the defendants' actions were, by definition, violent. According to Merriam-Webster Dictionary, one definition of violence is "intense, turbulent, or furious and often destructive action or force."[3] The defendant's threats—including that he was "gonna fucking murder [Victim-1's] whole fucking family" and "burn your fucking building to the ground with you inside of it and all your Jew friends—surely were intense, turbulent, and furious, and reflected a destructive force. While the violence in this case was not physical, but psychological, such violence can be no less terrifying. Congress and courts have recognized as much by deeming both 18 U.S.C. § 2261A and 18 U.S.C. § 875(c) crimes of violence. *See United States v. Moonda*, 347 F. App'x 192, 201 (6th Cir. 2009) (classifying 18 U.S.C. § 2261A as a crime of violence); *see also United States v. De La Fuente* 353 F.3d 766, 769-771 (9th Cir. 2003) (classifying 18 U.S.C. § 875(c) as a crime of violence). And here, the victims were in genuine fear for their lives, their livelihoods, and their children because of the defendant's violent threats. As Victim-1 put it: "[Hall's] actions were not merely threats; they were acts of hateful psychological warfare and rooted in sadistic emotional *violence*." (Ex. A (emphasis supplied)). Even the defendant's hired expert labeled these threats as violent. (Def. Ex. A at 6 ("Specifically, [Hall] contacted individuals in New York approximately 1,000 times and made anti-Semitic and violent threats.")). Beyond his violence, the defendant also deployed his arsenal of weapons—guns and a machete—in service of his cruel crusade of hate. Finally, the defendant's conduct clearly involved planning as well. The defendant methodically collected personal information about his victims to contact them and then leveraged that personal information to enhance the credibility of his threats. (PSR ¶ 10). While the defendant's letter to the Court expresses appropriate remorse, his submission downplays

---

[1] *See* FBI Crime Data Explorer, https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/hate-crime (last visited October 20, 2025).

[2] *See* https://www.osc.ny.gov/press/releases/2024/08/dinapoli-hate-crimes-surged-new-york-over-last-five-years.

[3] Definition: Violence, Merriam-Webster (2025), *available at* https://www.merriam-webster.com/dictionary/violence.

12

the nature of his offense conduct in a way that betrays a troubling lack of acceptance of responsibility for his conduct.

*Second*, the history and characteristics of the defendant support a sentence within the Stipulated Guidelines Range. That Hall was previously charged with stalking an Indiana judge and the judge's family—an offense for which there is an outstanding warrant for Hall's arrest, (PSR ¶ 21)—shows that the defendant's conduct in this case was far from an aberration. Indeed, his threatening individuals across the United States—from New York to Pennsylvania to Nevada, all in the months before his arrest in this case—reflects an individual with a vicious history of threatening conduct, especially towards Jews. Beyond his threats, the defendant has shown his propensity for violence, with state convictions for battery in 2010 and burglary in 2011. This prior criminal behavior displays a disturbing pattern of threats, violence, and disregard for the law. Viewed against this backdrop, it is not inconceivable that had law enforcement not apprehended Hall, he may have acted on his dangerous and anti-Semitic impulses and committed an act of physical violence against the victims. Regardless, the message he was communicating when he shared the victims addresses and sent photographs of weapons was clear: he had the knowledge and means to execute on his vile and violent threats.

Indeed, the defendant's own expert report underscores his dangerous tendencies. Among other things, Dr. Marc Gerber noted that that the defendant is in the 92nd percentile when it comes to anger regulation. (Def. Ex. A at 3). Put another way, the defendant has less of an ability to control his anger than over 90% of the population. While Dr. Gerber's report appropriately acknowledges the defendant's inability to manage anger, the report's conclusion that the offense conduct is therefore all the result of impulsivity is not credible on its face. According to Dr. Gerber, Hall's conduct "align[s] with his history of reacting strongly in the moment, rather than planning or premeditating his actions. In the context of charged online discussions, this impulsivity would make him particularly susceptible to escalating rhetoric, including the kind of threatening communications at issue in this case." (Def. Ex. A at 6). For one, it is not clear what, if any, materials Dr. Gerber reviewed in making this assessment, including whether he reviewed the approximately 1,000 threats Hall sent to his victims. If he did review these materials, it would likely be clear to him that an individual who sends a thousand verbal, written, and photographic threats over a three-month period is not acting impulsively "in the moment," to borrow Dr. Gerber's phrase. (*Id.*). Nor is an individual who tracks down the addresses and phone numbers of his victims and spends months describing in vulgar detail how he will rape and mutilate their children acting spontaneously or reactively. Hall's lack of anger regulation, combined with his deep-seated anti-Jewish prejudice, makes him a continuing danger to the victims, and those around the country who are, or are perceived to be, Jewish. Thus, the defendant's history and characteristics weigh in favor of a Guidelines sentence.

*Third*, the need to promote specific and general deterrence weigh strongly in favor of a sentence within the Stipulated Guidelines Range. Notably, nearly all these threats occurred *after* law enforcement contacted the defendant, on August 9, 2024, about his initial threats. (*See* PSR ¶ 13-17). And all of the threats occurred after a warrant had been issued for the defendant in connection with threats he made against the judge in Indiana. The defendant's continuation—and escalation—of his threatening behavior after being confronted by the authorities demonstrates a

severe and sustained disregard for the law. A Guidelines sentence of incarceration is thus necessary to deter the defendant from further endangering members of the Jewish community.

General deterrence principles also weigh heavily in favor of a Guidelines sentence here. As noted above, in the wake of the rise of anti-Semitic crimes over the past few years, many in the Jewish community—in New York and elsewhere—live in a state of constant fear for their safety and security. For example, a Washington Post article from this past week notes that "U.S. Jews increasingly say they are hiding their identity in a country where they believe they continue to face significant antisemitism and where slightly fewer than 1 in 5 feel very safe."[4] This sentiment is echoed by Victim-1: "This was not random harassment—it was a calculated campaign of anti-Semitic terrorism. Hall sought to dehumanize, intimidate, and silence us. He wanted us to feel hunted for being Jewish and for living openly and proudly as Jews in America." (Ex. A). A Guidelines sentence will send a message that violent attacks motivated by bias and hatred will not be tolerated. By contrast, a below-Guidelines sentence will send a message that such threats are not deserving of the sanction that Congress and the Sentencing Commission have deemed to be just punishment based on decades of collective sentencing experience.

*Fourth*, the need to avoid unwarranted sentencing disparities merits a sentence within the Stipulated Guidelines Range. Section 3553(a) demands consideration of "defendants with similar records who have been found guilty of similar conduct." As reflected in the PSR:

> During the last five fiscal years (FY2020-2024), there were 7 defendants whose primary guideline was §2A6.2, with a Final Offense Level of 22 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 7 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 52 month(s) and the median length of imprisonment imposed was 51 month(s).

(PSR at 22). More pointedly, around the country, defendants convicted of making threats are regularly sentenced within and above the applicable Guidelines range. *See*, *e.g.*, *United States v. Christopher McCarty*, 25 Cr. 34 (N.D.N.Y. 2025) (60-month statutory maximum sentence for threats against judges); *United States v. Domagoj Patkovic*, 24 Cr. 317 (RER) (E.D.N.Y. 2025) (60-month sentence for hoax bomb threat phone calls to Jewish hospitals and care centers in New York); *United States v. Brendan Vaughan*, 19 Cr. 526 (KMK) (S.D.N.Y. 2020) (60-month statutory maximum sentence for threats, including anti-Semitic threats); *United States v. Eric Lin*, 19 Cr. 20551 (S.D.F.L. 2020) (60-month statutory maximum sentence for anti-Semitic and anti-Hispanic threats).

---

[4] *See* WASH. POST (Oct. 15, 2025): More U.S. Jews shield identity in public amid antisemitism fears, Post poll finds, *available at* https://www.washingtonpost.com/nation/2025/10/15/us-jews-poll-safety-antisemitism/.

14

*Finally*, a Guidelines sentence is needed to promote respect for the law.  As noted, in the wake of the many horrendous antisemitic hate crimes committed over the past few years, Jewish individuals are increasingly alert to the possibility that their community—indeed, their families and children—could be next.  These emotions profoundly affect communities across the nation, placing them in constant fear for their safety and security.  The defendant tracked down personal information about his Jewish victims and preyed on this profound sense of fear.  Even if he never intended to carry out an attack—which is not at all clear from his conduct—his threats and conduct terrorized the victims and the staff of the Hotel.  That is the nature of such threats: given the stakes, they must be taken as viable and credible.  And they leave a lasting emotional toll on the number of people who live through them.  None of Hall's touchpoints with law enforcement or his prior arrests—including for violent conduct—deterred him from continuing to engage in violence and continuing to threaten Jews.  It was only after the defendant was detained that his threats spree ended. In a case like this one, where the victims have experienced deep psychological harm, and where the defendant's conduct has persisted—and in many ways worsened—despite law enforcement contact, a Guidelines sentence is warranted.

### F. Conclusion

For the reasons discussed above, the Government respectfully requests that the Court impose a sentence within the Stipulated Guidelines Range of 41 to 51 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

    Respectfully submitted,

    JAY CLAYTON
    United States Attorney

By: /s/ _____
    Sam Adelsberg
    Assistant United States Attorney
    (212) 637-2494

cc: Defense counsel (by ECF and E-mail)

# Exhibit A

**Victim Impact Statement: Anti-Semitic Death Threats by Donovan Hall**

For more than three months, my family, employees, and I lived in a state of relentless fear caused by Donovan Hall. His campaign of harassment, intimidation, and anti-Semitic and racist hate invaded every corner of our lives—our home, our business, and even our sense of safety as parents.

Hall contacted us over a thousand times. He called our business, our home, and my personal cell phone often dozens of times a day, including in the middle of the night. He would say that he was outside our door or "on the way," threatening to kill us, mutilate us, and rape our staff. He repeated our home address aloud during his threats, a chilling reminder that he knew exactly where we lived.

We constantly feared for our children's safety. The thought that someone who hated enough to want to kill us and our children us  was unbearable. The fear our children felt, and the anxiety it caused them, made this period extraordinarily difficult to cope with as a family. Every sound outside, every unfamiliar car, every late-night phone call filled us with dread.

Hall's violent anti-Semitic. Threats were brutal, and vile and invoked Jewish horrors of Gas Chambers and Crematoriums. He expressed fantasies of inflicting pain and our children. He sent text messages with images of guns, knives, and a machete, promising to use them.

At our workplace, the impact was devastating. Our employees were terrified. One young woman quit after receiving one of his calls. An intern placement agency withdrew its students, fearing for their safety. The constant ringing of the phones, tied up by his repeated calls, brought our business to a standstill and filled the air with panic. We would watch the door or call the police to say he was on his way. Taking away police resources from places, it was needed.

This was not random harassment—it was a calculated campaign of anti-Semitic terrorism. Hall sought to dehumanize, intimidate, and silence us. He wanted us to feel hunted for being Jewish and for living openly and proudly as Jews in America.

The toll this took on our family cannot be overstated. We lived without peace or rest. Nights were sleepless. Our children were anxious and frightened; a ringing phone or a knock at the door brought feelings of fear and helplessness.

We are proud Jews and proud Americans. We have built our lives and our business around community, creativity, and faith. To be targeted so hatefully because of the anti Semitic, contagion for who we are was a deep violation, not only of our safety, but of our humanity.

We ask this Court to recognize the gravity of Donovan Hall's crimes and the enduring impact they have had on our family and employees. His actions were not merely threats; they were acts of hateful psychological warfare and rooted in sadistic emotional violence.

We ask for a sentence that reflects the seriousness of this conduct, ensures the safety of others, and sends a clear message that such anti-Semitic terror will never be tolerated in our society. Especially at this time in NYC , when so many of us are concerned about the City's future and the safety for daily Jewish life.

Justice in this case is not only about punishment—it is about reaffirming the principle that every person, regardless of faith, has the right to live without fear.

Very Truly Yours

███████████